UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:15-cr-279 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| GREGORY L. WADE, *et al.*, | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

By separate motions, defendants, Gregory Wade ("Wade") and Richard James ("James"), seek to suppress all evidence seized during the June 10, 2015 search of Wade's residence located at 130 Roger Avenue in Akron, Ohio. (Doc. No. 17 ["Wade Mot."]; Doc. No. 19 ["James Mot."].) The government filed a consolidated response to the suppression motions. (Doc. No. 24 ["Res."].) Wade also filed a supplemental motion, challenging the admissibility of statements he made while in the back of a police car prior to being transported to the police station. (Doc. No. 26 ["Wade Supp. Mot."].) The government filed a response to this supplemental motion, as well. (Doc. No. 27 ["Supp. Resp."].) On September 8, 2015, the Court conducted an evidentiary hearing on the motions. At the conclusion of the hearing, the Court took the matter under advisement.

I. **BACKGROUND**

The Court begins with the few facts for which there is agreement. Officers from the Akron Police Department ("APD") responded to an agency call that a child was feared to be endangered at Wade's residence. Prior to arrival, the officers had not secured a search warrant

for the residence. Upon arrival, Wade permitted the officers to enter the kitchen, and, eventually officers searched other rooms in the home. The search yielded drug paraphernalia, evidence of an inoperable marijuana grow operation, controlled substances, firearms, and ammunition. During the search, James was found in the southwest bedroom of Wade's residence. A nine millimeter pistol was recovered from the bedroom James had been occupying.

*The Government's Position*

Officer Adam Lemonier, a 16-year veteran of the APD, testified that he, Officer Gregory Moenich, and Lieutenant Brian Simcox were members of the Clandestine Lab Enforcement Team ("CLET"), which is tasked with investigating and dismantling methamphetamine laboratories. According to Officer Lemonier, Officer Moenich advised him and Lt. Simcox that dispatch requested a response to a call from Summit County Children's Services Board ("CSB") that there was reason to believe that a minor was living at the Roger Avenue residence at which there were drug-related activities, including the potential operation of a methamphetamine lab.[1] Officer Lemonier and his fellow CLET members were already familiar with Wade and the Roger Avenue residence as the APD had received prior calls of drug activity at that location. Given the possibility that a methamphetamine lab was being operated in the presence of a minor, the three officers agreed that they should respond to the call.

Lt. Simcox, who was accompanied by Officer Brandon King, proceeded to the residence, while Lemonier and Moenich took positions on nearby streets. Within minutes, Lt. Simcox radioed Moenich and Lemonier that a sport utility vehicle ("SUV") had pulled up to the residence. He requested that Lemonier and Moenich immediately proceed to the residence. A

---

[1] Defendants do not challenge the validity of the call placed by CSB or the officers' reliance on the call in proceeding to Wade's residence.

woman exited the car and headed toward the home. Officer Lemonier, along with Officer Moenich, approached the woman and advised her that they were responding to a report that a child was present in a residence where drug activity and methamphetamine production was taking place. Officer Lemonier asked if they could come in and speak with Wade. The woman, who identified herself as "Stacie Cooper," indicated that she would have to go and get Wade. When Wade appeared at the door, Officer Lemonier advised him that the APD had received a call from CSB that there was a child in the residence in the presence of drug activity and a methamphetamine lab. Officer Lemonier asked Wade if he would show them around the home.[2] Wade agreed to the search, invited the officers inside, and gave them consent to search. Officer Lemonier testified that this consent was not qualified by Wade in any way.

Wade led Moenich and Lemonier through the kitchen into the dining room where officers observed lithium batteries, which they recognized as a key ingredient in methamphetamine production. After Wade led the officers through the dining room to the living room, the three doubled backed through the dining room and the kitchen and went downstairs to the basement, where officers saw some old ammunition on a workbench. After the search of the basement was underway, Lieutenant Simcox joined them briefly before he went into a second room in the basement and discovered the remnants of a marijuana grow operation and a small amount of marijuana. Before the group left the basement, Lieutenant Simcox advised the other two officers that Ms. Cooper was not being honest about her identity. A check revealed that her real name was "Belinda," and that she had a warrant out in Portage County for her arrest on drug charges. (Doc. No. 28-2 ["Field Arrest B. Cooper"] at 102.)

---

[2] In rebuttal testimony, Officer Moenich echoed Officer Lemonier that Wade was informed that the agency call concerned a child exposed to drug activity and methamphetamine production.

When the group returned to the kitchen, the officers observed Cooper in a nearby bedroom. Recognizing that Cooper had been evasive as to her identity, officers proceeded with Wade to the bedroom and asked Cooper to exit the room. Officer Lemonier then entered the bedroom first and began a visual inspection of the room. To his immediate right he saw a dresser with an open drawer. Visible in plain view in the open drawer was a bag of marijuana, two digital scales, and a box of ammunition. According to Officer Lemonier, Wade then volunteered that "Oh, by the way, I have two rifles there," indicating the two long guns propped up against the wall near the dresser. Officer Lemonier thanked Wade for his honesty, noting that he did not want anybody to get hurt. After the weapons were discovered, Wade and Cooper were handcuffed, taken into custody, and removed from the house. As they exited the house through the kitchen, they found a neighbor, Steve Linton, there. Unsure of his relation to the residents of the house, they placed him in handcuffs and left him on the front porch with JW, Wade's seven-year old daughter, and the minor that was the subject of the CSB call.[3]

Lieutenant Simcox, an 18 year veteran of the APD, also offered testimony at the hearing. He testified that when the rifles were discovered in the location indicated by Wade, he made the decision to place Wade under arrest for possessing the weapons as a convicted felon and to arrest Cooper on the outstanding warrant. He also made the decision to seek a search warrant before conducting a more thorough search of the residence, and instructed the officers to remove all occupants from the residence for officer safety. While Officers Moenich and

---

[3] Wade told the officers that JW was his daughter, and that her mother had recently given Wade permission to have JW visit with him on certain weekends in order to establish a relationship with her. JW had been walking her puppy in the neighborhood when officers first searched the residence, and had returned shortly before Wade and Cooper were removed from the house.

Lemonier were removing Wade and Cooper from the residence, Lieutenant Simcox noticed the sound of music or a television coming from behind a closed door that he believed was a closet but turned out to be a second bedroom. He knocked on the door, and James opened it. James was wearing pants but no shirt. He advised James to exit the room because the police were going to get a search warrant, and James asked him if he could retrieve a shirt. Lieutenant Simcox told him that he would get him a shirt and asked him if he had any weapons in the room. When James responded that he had a gun in the room under his pillow, Lieutenant Simcox told him to sit down while Simcox quickly located the gun under a pillow on the bed. Lieutenant Simcox asked Officer Moenich to enter the bedroom and secure the weapon, which Moenich ultimately did. Because Lieutenant Simcox only had access to three sets of handcuffs, the cuffs were taken off Linton and placed on James.

As Lieutenant Simcox was leaving the premises to obtain the search warrant, Officer King advised him that Wade, who was already in one of the police cruisers, wished to speak with him. Wade asked Simcox if he was getting a search warrant, and Simcox confirmed that he was leaving for that purpose. Wade told him that when they executed the search warrant they would find methamphetamine and a gun in a safe in the house. Lieutenant Simcox assured Wade that if he gave the remaining officers the combination to the safe, they would not have to damage it to get it opened. Officer Moenich testified that Wade eventually provided him with the safe's combination.

According to the government, the warrantless search of Wade's residence was justified by Wade's unconditional consent. As for Wade's statements regarding the safe, it is the government's position that they were volunteered and were a natural and automatic response to unfolding events during the normal course of an arrest.

5

*Wade's Position*

Wade takes issue with much of the government's account of the events of June 10, 2015. At the hearing, Wade testified that he was asleep in the bedroom when Cooper woke him and told him that officers were at the side door. According to Wade, the officers advised him that they were there for the purpose of performing a "welfare check" on the minor child living at the residence. He stated that he permitted the officers access to the kitchen for the sole purpose of determining that there was food and water available for his daughter. He insists that his consent was limited to this purpose and did not include the consent to search any other room in the house. Once the officers could see that Ms. Cooper was preparing dinner on the stove, and that there was running water, he claims he advised them "Now that you see there's nutrition [for the minor], you could go ahead and go." He claims that the officers "acted like they didn't hear" his instruction to leave and proceeded to the basement. He followed the officers as they moved throughout his residence, and admitted that he did not repeat his request that they leave his home.

After he was removed from the home and placed in a cruiser, Wade claims that one of the officers (he believed that it might have been Lieutenant Simcox) asked whether there were any methamphetamine in the house, and, specifically, whether it would be found in the safe. According to Wade, he did not initiate the conversation and it occurred before he was read his *Miranda* warnings, which the parties agree—for purposes of Wade's supplemental motion— did not take place until after Wade was transported to the police station.

Wade maintains that the statements he made in the police cruiser were in response to police interrogation and must be suppressed. He also insists that the officers' search exceeded the scope of his consent, and the proceeds of the warrantless search, therefore, must also be suppressed.

6

*James's Position*

James also took the stand at the hearing. He testified that he was leasing the southwest bedroom from Wade. According to James, he was getting dressed when he heard a knock at his bedroom door and the announcement "This is the Akron Police Department. Come out with your hands up." He unlocked the door and opened it, and found three to four officers in the hallway. He testified that someone grabbed his arm, spun him around, and steered him to the dining room. Once he was out of the bedroom, James maintains that Officer Lemonier proceeded to search his room without his consent. Officer Lemonier asked him if there were any weapons in the room, and James admits that he volunteered that he had two airsoft pistols underneath the couch.[4] Officer Lemonier continued to search, and advised James that if there were any other guns in his bedroom and James admitted it up front, he would take his cooperation into consideration. After a brief period of reflection, James states that he decided to tell Officer Lemonier about the nine millimeter weapon.

James does not challenge the admissibility of any statements he made during the search of his bedroom.[5] Still, he claims that the nine millimeter weapon must be suppressed because he did not consent to the search of his bedroom.

---

[4] Airsoft pistols shoot plastic pellets. The parties agree that it is not unlawful for a convicted felon, like James, to possess such items.

[5] At the evidentiary hearing, counsel for both defendants confirmed that their clients were not challenging the admissibility of any statements defendants made while still in Wade's home as neither man was in custody at the time.

**II.  GOVERNING LAW ON CONSENT**

The Fourth Amendment permits warrantless searches if valid consent to search is given. *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011) (citing, among authority, *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010)). "'The government bears the burden of demonstrating by a preponderance of the evidence, through clear and positive testimony, . . . that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *Id.* (quoting *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009) (quotation marks and citation omitted)). "Voluntariness is determined by examining the totality of the circumstances." *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (citing, among authority, *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)).  Relevant factors that weigh on the Court's determination of voluntariness include: the consenting individual's knowledge of the constitutional right to refuse consent, the individual's age, intelligence, education, language skills, the individual's attitude regarding the likelihood that the search will yield contraband, the length of detention and nature of questioning, and any threat of punishment or coercive tactics by police. *See Bustamonte*, 412 U.S. at 226 (collecting cases); *see, e.g., United States v. Lopez-Medina*, 461 F.3d 724, 738 (6th Cir. 2006) (consenter clearly understood the English language); *United States v. Elkins*, 300 F.3d 638, 649 (6th Cir. 2002) (knowledge of right to refuse demonstrated).

The scope of a consent search may not exceed the scope of the consent given, and it is determined by asking how a reasonable person would have understood the conversation between the officer and the suspect or third party when the consent was given. *Compare United States v. Adams*, 583 F.3d 457, 464-65 (6th Cir. 2009) (consent to search hotel room not

exceeded when officer lifted jacket from floor of room); *with United States v. Henry*, 429 F.3d 603, 616-18 (6th Cir. 2005) (scope of search to confirm residence did not include search of gym bag) (quotation marks and citation omitted). Generally, the expressed object of a search defines the scope of consent, unless the suspect or third party giving consent expressly limits the scope. *See Fla. v. Jimeno*, 500 U.S. 248, 251, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991).

Consent to search can also be revoked. If a person effectively withdraws consent before the search is completed, police may not continue to search based on prior consent. *United States v. Buckingham*, 433 F.3d 508, 513 (6th Cir. 2006) (citing *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999)). Additionally, if two residents are present during the search request and one expressly denies consent, the other's consent is not valid. *Georgia v Randolph*, 547 U.S. 103, 122-23, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006). Of course, to invalidate another's consent, the objector must have a reasonable expectation of privacy in the place to be searched.[6] *See United States v. Ayoub*, 498 F.3d 532, 539 (6th Cir. 2007).

As for Wade's request to suppress certain statements he made in the police cruiser, it is well settled that statements made by a defendant in response to police interrogation while in custody are not admissible unless the defendant was first apprised of his constitutional right against self-incrimination. *See United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). However, "[v]olunteered statements of any kind are not barred by the Fifth Amendment . . . ."

---

[6] In his motion, James suggested that he invalidated any consent given by Wade. At the evidentiary hearing, however, his counsel conceded that James only had standing to contest the search of the southwest bedroom. Further, as the testimony unfolded at the hearing, it became clear that James was not present when Wade gave his consent for the search, as James was locked in his bedroom.

*Miranda*, 384 U.S. at 478. Police questions that merely are a "natural and automatic response to the unfolding events during the normal course of an arrest," do not constitute custodial interrogation for which *Miranda* warnings are required. *See United States v. Woods*, 711 F.3d 737, 741 (6th Cir. 2013) (during pat down, question "What is in your pocket?" was not an "investigatory question or otherwise calculated to elicit an incriminating response . . . ."); *United States v. Collins*, 683 F.3d 697, 703 (6th Cir. 2012) (defendant's volunteered statement "I'll take the charge," relating to a gun charge for the gun found in a jeep was not a response to questioning but was a response to the officer's truthful observation that all occupants of the jeep would likely be taken into custody and charged with felon in possession, which was an accurate statement about the next step).

### III. APPLICATION OF LAW TO THE PRESENT SEARCH

The parties agree that Wade's initial suppression motion turns largely on a factual determination as to the communication between Wade and the officers relative to the search and any consent given, revoked, or refused. The factual determinations, in turn, hinge on credibility calls. If the facts favor the government's version of events, the scope of the search to determine whether drug activity (including the operation of a methamphetamine lab) was taking place in the house would naturally include a search of the bedrooms and the basement where such activity was likely to take place. *See United States v. Coleman*, 588 F.3d 816, 820 (4th Cir. 2009) (search of whole house not exceeded scope where consent given to search entire house and property). If defendant Wade's position is to be credited, however, any search beyond the kitchen would likely exceed the scope. *See Henry*, 429 F.3d at 616-18.

Having reviewed the evidence and observed the witnesses as they testified at the hearing, the Court credits the government's position. The officers testified consistently and

credibly that Wade was advised that the officers were responding to a call that a child was in danger because of her proximity to drug activity and the suspected operation of a methamphetamine laboratory. Such a conclusion is supported by the police incident report that records the call as pertaining to the welfare of a minor, and specifically references Wade's known past drug activity and the existence of a "possible meth lab." (Doc. No. 28-1 ["APD Incident Rep."] at 100.) Further, both Officer Lemonier and Lieutenant Simcox testified that they chose to respond to the call because of their training in detecting and dismantling methamphetamine labs and their appreciation for the volatile and explosive nature of such operations. With that as their clear purpose in electing to respond to the call, it is unlikely that they would have unnecessarily limited their request for permission to perform a "welfare check."

In contrast, the Court finds Wade's alternative explanation of the events surrounding the request and search incredible. Putting aside his strong incentive to lie, the Court observed that Wade was evasive on the stand and had difficulty recalling the events. Moreover, while Wade insisted that the scope of his consent stretched only so far as the contents of the kitchen, he admits that he simply followed the officers around his house, never once repeating his earlier request that they leave. Such conduct is inconsistent with his position that he severely limited the scope of the consent and eventually revoked it entirely. This is particularly so in that Wade testified that when he informed the officers that he wanted them to leave, they acted like they didn't hear him but Wade apparently did nothing to make sure that he concerns were actually heard. It is more likely that Wade said nothing at all.

Ultimately, the Court finds that the scope of Wade's consent to search included all rooms and areas where a methamphetamine lab might be located, which a reasonable person would have understood to include bedrooms and the basement. Moreover, the Court finds that

this consent was voluntary. The officers and Wade testified that the officers never pulled their weapons on Wade, or otherwise threatened him. In fact, Wade had some familiarity with the officers and it appeared by all accounts that the atmosphere leading up to and during the search was cordial and relaxed. On this note, the Court specifically credits Officer Lemonier's testimony that Wade was calm and understood the request for consent by responding "Sure. Come on in."[7] *See, e.g., Canipe*, 569 F.3d at 604 (consent voluntary and not the result of police coercion where suspect advised officers that the search "wouldn't be a problem"). Additionally, the Court finds that Wade never revoked or rescinded his consent. Accordingly, Wade's motion to suppress the fruits of the consent search is DENIED.

As for the statements Wade made in the cruiser, the Court finds that the government established through credible testimony that the statements relating to the contents of the safe were volunteered and not the product of police interrogation. Wade does not contest that Lieutenant Simcox was already leaving the scene to secure a search warrant for the residence and its contents. The search warrant, in turn, would have permitted the officers to break open the safe and search its contents. It defies logic that Lieutenant Simcox would have interrogated Wade regarding the safe if he was about to obtain the means to lawfully search it.[8] Wade's motion to

---

[7] A reasonable person may question why, under the circumstances, Wade would consent to such a search. However, Wade would have known that there was no methamphetamine operation in his home, and officers testified that the inoperable marijuana grow equipment and the small amount of marijuana would not have likely lead to an arrest or a decision to obtain a search warrant. As for the rifles in the bedroom, the officers testified that they entered the bedroom because they saw Cooper in it, and they had just discovered that she had lied about her identity and that she had an outstanding warrant for her arrest. Because Wade kept referring to his girlfriend by her real name, he obviously did not know that she was going to arouse suspicion by lying about her identity. He may also have believed that the truly damaging evidence—the methamphetamine in the locked safe—would never be discovered.

[8] Additionally, both Simcox and Lemonier testified consistently and credibly that, though they could have thoroughly searched the residence based on Wade's consent, or incident to his arrest, they believed that obtaining a search warrant was the "safest" course to take.

suppress the statements made in the cruiser and the contents of the search as fruits of a poisonous tree is DENIED.

Moreover, the fact that Lieutenant Simcox was already pursuing a search warrant supports a finding that the contents of the safe would also be admissible under the inevitable discovery exception to the exclusionary rule. Under this exception, a court may admit illegally obtained evidence if the evidence would inevitably have been discovered through independent, lawful means. *See Murray v. United States*, 487 U.S. 533, 539, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988) (because tainted evidence would be admissible if discovered through an independent source, it should be admissible if it would inevitably have been discovered); *see also Nix v. Williams*, 467 U.S. 431, 446, 104 S. Ct. 2501 (1984) (To exclude "physical evidence that would inevitably have been discovered, adds nothing to either the integrity or fairness of a criminal trial.") Because the search warrant would have permitted officers to view the contents of the safe, any prior illegal questioning cannot be said to have poisoned the subsequent search. *See, e.g., United States v. Hodge*, 714 F.3d 380, 388 (6th Cir. 2013) (evidence admissible despite illegal questioning of defendant because evidence would have inevitably been discovered in the home pursuant to a valid search warrant) (citations omitted).

Turning to James's motion to suppress, the government argued at the hearing that James was discovered in the southwest bedroom during a protective sweep of the home. James's statement about the weapon constituted a volunteered statement that took place during the normal course of the search and attempt to secure the residence. The government insists that the nine millimeter weapon is also subject to admission under the inevitable discovery exception.

In this regard, the Court finds the Sixth Circuit's decision in *United States v. Taylor*, 248 F.3d 506 (6th Cir. 2001), instructive. There, officers investigating a report that

defendant had been involved in drug activity, arrived at defendant's apartment and were admitted by defendant's brother. Officers immediately saw in plain view the stem of a marijuana plant. At that point, officers informed defendant's brother that they were going to secure the premises while they obtained a search warrant. They further explained that they would be conducting a protective sweep of the premises to confirm that there were no other people in the apartment. During this protective sweep, the officers discovered defendant hiding in a bathroom with large quantities of marijuana.

Observing that the "United States Supreme Court has endorsed the practice of conducting a protective sweep of an area to ensure police officer safety when arresting suspects[,]" *id.* at 513 (citing *Maryland v. Buie*, 494 U.S. 325, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990)), the court noted that officers are permitted to perform such a sweep if they are able to "articulate facts that would warrant a reasonably prudent officer to believe that the area to be swept harbored an individual posing a danger to those on the scene." *Id.* (quoting *United States v. Biggs*, 70 F.3d 913, 915 (6th Cir. 1995)). The Court found that the officers acted properly to secure the premise while they waited for the warrant, and that they articulated sufficient facts to show that they had reason to believe that there were other people in the apartment who posed a threat to their safety, including the fact that they heard other voices and the shuffling of feet before they gained entrance to the apartment. *Id.* at 514. Additionally, the Court found that, even if the officers had not conducted the protective sweep, the subsequent search pursuant to the warrant would inevitably have led to the discovery of defendant and the drugs. *Id.*

Similarly here, the Court finds that the officers properly conducted a protective sweep of the home in anticipation of securing a warrant. Lieutenant Simcox testified credibly that he had reasonable to believe that there were guns, and possibly other individuals, in the

bedroom that might pose a threat to officer safety. He indicated that officers had already discovered two rifles in the home. He also testified that he was aware of Wade's interest in weapons and his past drug activity. Additionally, once he found James in the southwest bedroom and James told him about the gun, he had no way of knowing whether there was anyone else present in the home (or even in the bedroom) that could gain access to the weapon. Under these circumstances, Lieutenant Simcox was justified in making a protective sweep of the southwest bedroom to ensure officer safety until the search warrant could be obtained. The nine millimeter pistol will not be suppressed.

In so ruling, the Court notes that it did not find credible James's version of the events leading up to the discovery of the pistol. James appeared confused on the stand, and his account of the events was implausible. For example, he testified that when he opened his bedroom door, he was greeted by three or four police officers. As only four officials initially responded to the call regarding the minor, the Court would have to find that the officers left three individuals, two of which had already been arrested, unattended or under the supervision of one officer, to investigate a room where it was unknown whether any individuals were present.

Of course, even if the protective sweep were not warranted, the nine millimeter gun would inevitably have been recovered as part of the search pursuant to the warrant. *See Taylor*, 248 F.3d at 514 ("if officers had not made the protective sweep of the apartment, but had simply waited for the return of the officer who went for the search warrant—assuming, of course, that such a course of action had not resulted in an attack on the officers who remained in the apartment and the destruction of the evidence during the wait—the search pursuant to the warrant would inevitably have led to the discovery of [defendant and the drugs]"); *see, e.g., United States v. Delancy*, 502 F.3d 1297, 1314 (11th Cir. 2007) (drugs found in illegal protective

sweep of home admissible because they would have been discovered during subsequent consensual search). Having determined that the basis for the decision to obtain the search warrant—the long guns discovered in Wade's bedroom—came to light in the course of a valid consent search, the Court finds that officers would have inevitably discovered the pistol during their search incident to the search warrant. James's motion to suppress the nine millimeter weapon, therefore, is DENIED for this additional reason.

### IV. CONCLUSION

For all of the foregoing reasons, defendants' motions to suppress (Doc. Nos. 17 and 19) and defendant Wade's supplemental motion to suppress (Doc. No. 26) are DENIED in their entirety.

**IT IS SO ORDERED**.

Dated: September 24, 2015

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**